## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MODUPE WILLIAMS,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 15-4163** |
| | : | |
| **PENNRIDGE SCHOOL DISTRICT, et al.,** | : | |
| **Defendants.** | : | |
| | : | |

**Mitchell S. Goldberg, J.**                                                       **December 4, 2018**

### MEMORANDUM OPINION

Plaintiff, Modupe Williams, accuses Pennridge High School and two principals of turning a blind eye to race- and sex-based harassment and bullying by various students. Plaintiff has sued the Pennridge School District (the "School District"), Principal Tom Creeden, and Ninth Grade Principal Nicholas Schoonover (collectively, "Defendants") alleging violations of Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d, et seq., Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681, et seq., the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, et seq., 42 U.S.C. §§ 1981, 1983, 1988, and the First and Fourteenth Amendments of the United States Constitution. Defendants have moved for summary judgment.

While much of the conduct alleged is reprehensible, there is no genuine dispute as to any material facts for a jury to consider. Accordingly, I will grant Defendants' motion and enter judgment in favor of Defendants.

# I.     STATEMENT OF FACTS

The following facts are compiled from a review of the parties' Statements of Material Facts together with the exhibits attached to their Statements. Unless otherwise indicated, these facts are undisputed.

Plaintiff Modupe Williams, an African-American woman, was born on July 29, 1997. (Pl. Modupe Williams's Dep. ("Pl.'s Dep."), 16:25–17:6.) As of the date of her deposition in April 2018, Plaintiff was a junior at the University of New Haven, Connecticut. (Id. at 11:1–9.) Her claims stem from incidents occurring while she was a high school student at Pennridge High School ("Pennridge").

## A.     The Presidential Award

In the 2010–2011 school year, Plaintiff received the Presidential Award and was the only African-American student to receive that award. (Pl.'s Dep. 50:10–21.) At the awards ceremony, however, she was the only student who did not receive verbal recognition. (Id. at 50:16–52:17.) After the ceremony, she went to the guidance counselor, Gina Dubona, expressed that she was upset that her name did not get called, and was told that a mistake had been made. (Id. at 52:18–54:16.) Plaintiff claims that this omission was discriminatory because she was the only African-American girl to not have her name announced and because the counselor was dismissive when she complained. (Id. at 54:17–56:17.)

## B.     The Computer Lab Incident

In the 2011–2012 school year, Plaintiff was in a 19th Century American Culture class taught by Cara Lyn Gurysh. (Cara Lyn Gurysh Dep. ("Gurysh Dep.") 34:12–35:11.) On January 6, 2012, Plaintiff was working on a group project with two friends at a computer in the classroom when she asked Ms. Gurysh if she could go to the bathroom. (Pl.'s Dep. 57:16–58:8, 60:5–9.) When

Plaintiff returned from the bathroom, she noticed that her backpack was on the floor and there was a boy named Sammy sitting in her seat. (Id. at 58:9–20.) When Plaintiff said, "excuse me, I was sitting there," the boy replied, "well, not anymore." (Id. at 58:21–24.) Plaintiff told Ms. Gurysh, who responded, "oh, well, you can go to the library where there's computers there and you work by yourself over there." (Id. at 58:25–59:6.) Although Plaintiff protested and said her items were at the computer, Ms. Gurysh insisted that she go to the library. (Id. at 59:7–11.) Plaintiff claims that this incident was racially discriminatory because "[t]here was no reason that she should have given Sammy the seat, the white boy, . . . instead of having him go down to the library, being that [she] was using the computer first." (Id. at 59:13–60:3.)

According to Ms. Gurysh, when Plaintiff told her that Sam moved her bag away from the computer, Ms. Gurysh replied, "I'm sorry. I forget [sic] you put your bag there. Sam is now logged into the computer." (Gurysh Dep. 39:18–20.) Upon realizing that there were no more computers available that day, Ms. Gurysh told Plaintiff to use a computer in the library, knowing that she could work independently. (Id. at 39:20–40:4.) Although Plaintiff was the only student Ms. Gurysh sent to the library that particular day, Ms. Gurysh noted that the administration gave teachers the option of sending students to the library in order to access a computer when there were not enough in the lab. (Id. at 17:19–18:21, 34:18–22.)

Plaintiff and her mother, Deborah Williams, complained about this incident to Ms. Gurysh. (Pl.'s Dep. 60:13–20, 64:16–17.) Ms. Williams testified at her deposition that it took her multiple tries to get through to Ms. Gurysh until she saw Ms. Gurysh in the school hallway. When asked why she never followed up, Ms. Gurysh stated that "she felt it wasn't important." (Deborah Ann Williams Jan. 12, 2018 Dep. ("Williams 1/12/18 Dep."), 40:1–11.) According to Ms. Gurysh, she apologized if the incident upset her or Plaintiff. (Gurysh Dep. 49:10–15.) She indicated that the

incident had nothing to do with race, but was simply because she knew Plaintiff to be a capable and trustworthy student who could work independently in a different environment, and Sam was a student who would need prompting to make sure he remained on task. (Id. at 71:17–72:3.) Ms. Gurysh further stated that she has often sent other students, including Caucasian students, to the library. (Id. at 75:9–76:22.)

Plaintiff claims that her grade subsequently dropped in that class. (Id. at 63:16–19.) In the fourth quarter marking period of the 2011–2012 school year, she had all As and one B, the B being in Ms. Gurysh's class. (Pl.'s Dep. 128:17–9.) Although Plaintiff believed the incident affected her grade in the fourth quarter, Plaintiff admitted that she got a B in two prior reporting periods. (Pl.'s Dep. 131:13–132:2.)

### C.      The Phone Call Incidents

In early 2012, prior to spring break, Plaintiff started receiving calls to her cell phone coming from a private number, but she did not answer them. (Pl.'s Dep. 68:17–70:2, 73:22–25.) On April 4, 2012, the first day of spring break, Plaintiff was at her grandmother's house when additional calls were made to her cell from the private number. She decided to answer them to figure out why the same number kept calling her. (Id. 74:8–20.) Beginning with these calls and continuing to April 6, 2012, Plaintiff answered approximately nineteen phone calls wherein the callers referred to Plaintiff as a "b**ch" and made sexually vulgar statements along the lines of "you know us n**gers like to f**k in the ass." (Id. 74:21–75:14, 78:13–24.) The words "b**ch" and "n**ger" were used in multiple phone calls. (Id. at 79:17–23.) During one of the calls, the caller asked "how f***ing drunk were your parents when they named you Modupe." (Id. at 72:1–7.) Plaintiff stated that, many times, she would immediately hang up on whoever was calling. (Id. at 75:16–76:7.)

On Easter Sunday, Plaintiff first told her mother, Deborah Williams, that she was receiving these phone calls. (Id. at 81:18–19.) At some point, Williams began answering the phone and pretending to be Plaintiff. (Id. at 80:20–81:16.) The callers were young males and made similarly profane, racist, and sexually explicit comments. (Williams 1/12/18 Dep. 16:8–17:17.) During one of these calls, the caller revealed himself as Tom K. or Tom Kantner. (Pl.'s Dep. 76:21–77:6.)

That night, Williams called the Perkasie Police. (Id. at 84:20–85:17.) In the initial narrative prepared by Officer Thomas Brun, Williams stated that the calls had begun unexpectedly, that Plaintiff had not received any similar calls in the past, and that she had experienced no harassment while in school. (Dep. of Eric Richter ("Richter Dep."), Exh. P39.) Plaintiff confirmed, in a subsequent conversation with Officer Eric Richter also of the Perkasie Police Department, that she had not been a victim of harassment while at school and that the calls came as a surprise. (Id.) During a follow up phone call to Williams, Officer Richter requested a written statement and a print out of phone calls from Sprint. (Id.) Richter also received cell phone records directly from Sprint. (Id. at 26:6–14.) Eventually, the three callers were identified as Frankie Buccafuri, Tom Kantner, and Henry Savage. (Pl.'s Dep. 90:9–92:8.)

Several incidents at school ensued after spring break. Plaintiff testified that she heard, through the mom of a friend that, during the week following spring break, another girl said that Frankie Buccafuri was bragging to other students in the gym about making racial and sexist phone calls to Plaintiff. (Id. at 98:1–17.) That same week, Plaintiff caught another student, Brandon Windish, cheating off of her paper and when she told him to stop, he turned around to her in class and said, "are you going to call the cops on me, too?" (Id. at 102:2–4, 104:10–105:6.) Plaintiff assumed he was referring to the spring break phone calls. (Id.) Finally, in another incident, Plaintiff was walking down the hall when she heard an unknown boy say something to his friends

related to the statement previously made in one of the phone calls about "how f***ing drunk were you when your parents named you Modupe?" (Id. at 113:8–114:9.) The record does not provide any further details about these incidents.

On April 10, 2012, Williams reported the offensive phone calls to assistant principal, Nicholas Schoonover. (Dep. of Nicholas Schoonover ("Schoonover Dep.") 36:3–20.) Schoonover listened to recordings of some of the phone calls and understood that Williams had also contacted the Perkasie police about this issue. (Pl.'s Dep., Ex. 5.) Schoonover told Williams that because none of the calls occurred at school, it was not a school issue. (Id.) That same day, Schoonover met with Frankie Buccafuri, Tom Kantner, and Henry Savage individually to ask if they were involved, and they denied any involvement. (Schoonover Dep. 155:16–156:6.) Schoonover also reached out to Officer Richter, who relayed to him that "this was a community issue" and "was not related to in school" and advised him to not have any involvement in the matter. (Id. at 221:3–11.) Nonetheless, Schoonover met with Buccafuri, Kantner, and Savage a second time at Deborah Williams's request. (Id. at 221:12–14.)

Sometime in May, the Juvenile Probation Department of Bucks County initiated juvenile proceedings against Buccafuri, Kantner, and Savage. (Pl.'s Dep. 162:20–25.) As part of their Informal Probation, the boys were required to issue a letter of apology to Plaintiff and perform community service. (Id. at 163:2–12; 172:21–24.) Plaintiff was satisfied with the punishments they got from the juvenile court. (Id. at 171:3–6.) Schoonover testified that Plaintiff did not have any classes with any of the boys and he had no reports of her even seeing them after the incidents.[1] (Schoonover Dep. 203:14–204:5.)

---

[1] In her deposition, Plaintiff discussed one additional incident at the school. On May 14, 2012, Plaintiff reported to Schoonover that she noticed students taking pictures of her on the school bus. (Schoonover Dep. 207:24–208:12.) He investigated that complaint on the same day and confronted the named students, who willingly showed him their phones. (Id. at 209:2–8.) He saw

On May 25, 2012, Schoonover met with Plaintiff, Williams, and guidance counselor Lori D'Angelo to discuss Plaintiff's completion of the school year and her plans for the future. (Schoonover Dep. 66:3–11.) Williams revealed that Plaintiff had been going to a therapist and was being medicated as of a date in April, and they discussed the idea of homebound instruction to finish off the year. (Id. at 65:24–66:16.) They also discussed different options with mental health treatment. (Id. at 66:17–67:6.) Schoonover suggested that perhaps Plaintiff should be hospitalized over the summer, put into an alternative school for the fall, and then, when she was ready to cope with the students at Pennridge, she could return. (Id. at 115:3–13.)

Williams had another meeting with Schoonover and Principal Tom Creeden on May 31, 2012, at which time Ms. Williams presented them with a complaint alleging that Plaintiff was discriminated on the basis of race and sex during various incidents. (Schoonover Dep. 131:23–132:24.) Schoonover did not investigate that complaint as Williams did not leave a written copy with him or Dr. Creeden. (Id. at 133:13–134:8.)

At the conclusion of the meeting, Williams was very angry and demanded that the school officials not meet with Plaintiff without her being present. (Id. at 141:22–24.) Williams never tried to reach out to the school again and the school year ended a few days later. (Id. at 141:24–142:3.) At the end of the 2011–12 school year, Plaintiff and Williams relocated out of the school district. (Pl.'s Dep. 14:5–16.)

On July 29, 2015, Plaintiff filed suit against the School District, Dr. Tom Creeden, and Nicholas Schoonover. In her Second Amended Complaint, Plaintiff alleged: (1) a claim of race discrimination against the School District; (2) Title IX violations for gender discrimination against

that they had taken general pictures, not specifically of Plaintiff, while on the bus, and concluded no bullying occurred, a decision which he relayed to Plaintiff. (209:24–214:4.) Plaintiff does not allege that this incident is part of either her Title VI or Title IX claims.

the School District; (3) race and gender discrimination under the Pennylvania Human Relations Act ("PHRA") against all Defendants; (4) retaliation under Title VI against the School District; (5) retaliation under Title IX against the School District; (6) retaliation under the PHRA against all Defendants; and (7) a § 1983 violation against all Defendants. After Defendants filed a motion to dismiss, I dismissed all of the retaliation claims and Counts Five, Six, and Seven.

On April 30, 2018, Defendants moved for summary judgment on the remainder of the Second Amended Complaint.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).

A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. Id. at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001). Unsubstantiated arguments made in briefs are not considered evidence of asserted facts. Versarge v. Township of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

## III.    DISCUSSION

Plaintiff's claims against Defendants allege (a) race and gender discrimination under Title VI of the Civil Rights Act of 1965, 42 U.S.C. § 2000d et seq. ("Title VI"), Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"), and the Pennsylvania Human Relations Act, 42 Pa. Cons. Stat. § 953, et seq. ("PHRA") and (b) liability under 42 U.S.C. § 1983 based on a violation of the Equal Protection Clause and for failure to train.          **A.**

### Intentional Discrimination Under Title VI, Title IX, and the PHRA

Title VI of the Civil Rights Act provides, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Under Title VI, a plaintiff must show that there is racial or national origin discrimination and the entity engaging in discrimination is receiving federal financial assistance. Abdullah v. Small Bus. Banking Dept. of Bank of Am., Civ. A. No. 13–0305, 2013 WL 1389755, at *2 (E.D. Pa. Apr. 5, 2013) (citing Baker v. Bd. of Regents of Kan., 991 F.2d 628, 631 (10th Cir. 1993)), aff'd, 532 F. App'x 89 (3d Cir. 2013).  Title VI applies only to entities, Whitfield v. Notre Dame Middle Sch., 412 F. Appx. 517, 521 (3d Cir. 2011), and provides a private cause of action for intentional discrimination.  Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 562 (3d Cir. 2002).

The enactment of Title IX in 1972 was the culmination of efforts over several years to ban gender discrimination in the field of education.  Patterned after Title VI of the Civil Rights Act of 1964, "(t)he drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years." Cannon v. Univ. of Chicago, 441 U.S. 677, 695–96 (1979).  "Title IX was designed to fill the gap left by Title VI of the Civil Rights Act of 1964,

which did not prohibit discrimination based on sex." Grove City College v. Bell, 687 F.2d 684, 691 (3d Cir. 1982), aff'd, 465 U.S. 555 (1984).[2]

Plaintiff's Title VI and Title IX claims are premised on (1) incidents perpetrated by school officials and the School District itself and (2) incidents of student-to-student racial and sexual harassment. Defendants seek summary judgment on all such claims.

### 1.    Events Involving School Personnel

Plaintiff argues that she was subject to both racial and sexual harassment during two incidents at school. The first occurred when her name was omitted from the Presidential Awards ceremony. The second took place when Plaintiff was forced to leave the computer lab and use the library instead. Defendants respond that Plaintiff has not adduced any proof that either of these events were racially or sexually motivated.

"Private individuals who bring suits under Title VI [and Title IX] may not recover compensatory relief unless they show that the defendant engaged in intentional discrimination." Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 272 (3d Cir. 2014) (citing Guardians Ass'n v. Civil Serv. Comm'n of N.Y., 463 U.S. 582, 597, 607 (1983)). In an educational setting, a plaintiff must also prove that: (1) he is a member of a protected class; (2) he suffered an adverse action at the hands of the defendants in his pursuit of his education; (3) he is qualified to continue his pursuit of his education; and (4) he was treated differently from similarly situated students who are not members of a protected class. Ke v. Drexel Univ., No. 11-6708, 2015 WL 5316492, at *17 (E.D. Pa. Sept. 4, 2015) (citing Bell v. Ohio State Univ., 351 F.3d 240, 252–53 (6th Cir. 2003)). If a

---

[2]    Although the PHRA is a separate statute under Pennsylvania law, its proscriptions have generally been construed to be coextensive with their federal counterparts. Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996). As such, the provisions of the PHRA are generally construed in parallel with federal anti-discrimination statutes unless a difference in the applicable statutory language indicates that a different construction is warranted. Fogleman v. Mercy Hosp., 283 F.3d 561, 567 (3d Cir. 2002).

plaintiff is able to make a prima facie case under these four elements, the burden then shifts to the defendant, who must "articulate some legitimate non-discriminatory reason" for the adverse action. Id. If a defendant satisfies this standard, a plaintiff would then have to show that the legitimate non-discriminatory reason was mere "pretext" for unlawful discrimination. Id. A showing of pretext requires proof that each of the defendant's proffered nondiscriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the adverse action. Id.

Notably, Title VI protects students from discrimination only if it is based on race, color, or national origin, Bridges ex rel. D.B. v. Scranton Sch. Dist., 66 F. Supp. 3d 570, 589 (M.D. Pa. 2014), while Title IX only provides a remedy for sexual harassment, including sexual discrimination or unwelcome sexual advances. Dawn L. v. Greater Johnston Sch. Dist., 586 F. Supp. 2d 332, 365–66 (W.D. Pa. 2008). A plaintiff must raise at least an inference of discrimination to move forward with a Title VI or Title IX claim. Bridges ex rel. D.B. v. Scranton Sch. Dist., 644 F. App'x 172 (3d Cir. 2016). If a plaintiff is unable to prove intentional discrimination on the basis of race or sex, then the plaintiff's claims under Title VI and Title IX respectively must fail. Ke, 2015 WL 5316492, at *12.

Here, Plaintiff has failed to produce any evidence from which a reasonable juror could draw an inference of racial or sexual bias inherent in either of the events perpetrated by the School District personnel. First, as to the Presidential Award incident, Plaintiff contends that she was the only African-American student to receive the award, and the only student who did not receive verbal recognition at the ceremony. According to Plaintiff's testimony, when she went to the guidance office, the guidance counselor apologized and said they had made a mistake. Plaintiff received her award at that time. Aside from the fact that Plaintiff was the only African-American to receive the award and the only student whose name was not called, no other facts exist from

which to draw any inference that this incident was racially motivated.  Bridges, 644 F. App'x at 79 (holding that the mere fact that a student was the only African-American in his or her class and was treated differently was insufficient to raise an inference of discrimination).

Similarly, with respect to the computer lab incident, Plaintiff contends that she was at a computer and left to go to the bathroom.  When she came back, another student—a white male— had taken her seat and thrown her backpack on the floor.  Instead of directing the white student to go to the library, the teacher, Ms. Gurysh, instructed Plaintiff to go to the library.  Although Ms. Gurysh's decision could be reasonably viewed as unfair, Plaintiff's "subjective belief that these comments display direct racial animus is not sufficient to overcome a Motion for Summary Judgment challenging whether direct evidence of intentional discrimination has been shown." Ke, 2015 WL 5316492, at *15; see also Tucker v. Thomas Jefferson Univ., 484 F. App'x 710, 712 (3d Cir. 2012) (employee's failure to offer evidence other than his subjective belief that race played a part in his firing was insufficient to withstand summary judgment).  Moreover, Ms. Gurysh offered a legitimate, non-discriminatory reason for her actions, noting that she did not have enough computers for all of the students in the classroom and she believed that Plaintiff was more capable of independent work than the male student.  Plaintiff has offered no evidence to establish that this reason is a pretext for discrimination.

In short, Plaintiff has not met her burden of producing evidence from which a reasonable factfinder could infer that these incidents were motivated by racial or sexual animus.  As no genuine issue of material fact remains, I will grant summary judgment on the Title VI and Title IX claims to the extent they are premised on these incidents.

2.    Student-on-Student Harassment

Plaintiff also brings Title VI and Title IX claims against the School District on the grounds that it was deliberately indifferent to the harassment of Plaintiff by other students.

It is well settled that a school district's deliberate indifference to sexual or racial harassment of a student by another student can constitute sex or race discrimination under Titles VI and IX. Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 643 (1999). The United States Supreme Court has set forth six factors that a plaintiff must establish to hold a school district liable for student-on-student racial or sexual harassment:

> (1) the defendant receives federal funds; (2) sexual [or racial] harassment occurred; (3) the harassment occurred under "circumstances wherein the recipient exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]," (4) the funding recipient had "actual knowledge" of the harassment; (5) the funding recipient was "deliberately indifferent" to the harassment; and (6) the harassment was "so severe, pervasive, and objectively offensive that it [could] be said to [have] deprive[d] the victims of access to the educational opportunities or benefits provided by the school."

Id. at 644–45, 650.

Here, Defendants contend that Plaintiff's Titles VI and IX claims fail because Plaintiff has not demonstrated that (a) all of the challenged harassment occurred under circumstances where the School District exercised control over the harassing students and the context in which the known harassment occurred, or (b) the harassment was so severe, pervasive, and objectively offensive that it could be said to have deprived Plaintiff of access to educational opportunities.

      *a.*    *Whether the Harassment Occurred in Circumstances Under the Control of the School District*

Defendants first contend that Plaintiff cannot succeed on a Title VI or IX claim based on the harassing telephone calls because these events occurred off of the school grounds and outside of school hours.

In order for harassment by a student against another student to be actionable against the school district, "the harassment must take place in a context subject to the school district's control." Davis, 526 U.S. at 645. In other words, a school district's damages liability is limited to "circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." Id. "Only then can the [school district] be said to 'expose' its students to harassment or 'cause' them to undergo it 'under' the [school district's] programs." Id. "Where . . . the misconduct occurs during school hours and on school grounds . . . . the misconduct is taking place 'under' an 'operation' of the [school]." Id. at 646. In such circumstances, the school retains substantial control over the context in which the harassment occurs. Id.

Repeatedly, courts have found that harassment that takes place off of school grounds and/or outside of school hours does not occur under circumstances where the District exercised substantial control over either the harasser or the context in which the harassment occurred. M.S. v. Susquehanna Twp. Sch. Dist., No. 13-2718, 2017 WL 6397827, at *10 (M.D. Pa. 2017) (harassment through social media not within school district's control); Dawn L. v. Greater Johnstown Sch. Dist., No. 06–19, 2008 WL 857453, at *10 n.3 (W.D. Pa. March 31, 2008) (excluding from the harassment action at the summary judgment stage any acts by the offender that occurred "outside of the School."); C.S. v. S. Columbia Sch. Dist., No. 12-1013, 2013 WL 2371413, at *9 (M.D. Pa. 2013) (holding that the school district cannot be liable for the sexual assault of plaintiff by other students that occurred during the summer and off of school property,

but could be held liable for continued harassment by those students during the school day); see also HB v. Monroe Woodbury Central Sch. Dist., 11-5881, 2012 WL 4477552, at *16 (S.D.N.Y. Sept. 27, 2012) (allegations of molestation by two other students occurring off of school grounds and outside of school hours does not show control by school district, even where school subsequently allowed harassers to be in same lunch period as plaintiff); Doe v. Round Valley Unified Sch. Dist., 873 F. Supp. 2d 1124, 1136 (D. Ariz. 2012) (declining to find "substantial control" by school district where the offending student sexually assaulted the plaintiff off school premises, even though he asked her out while on school property).

Here, it is undisputed that all of the harassing phone calls occurred outside of school hours and off school premises. According to Plaintiff's own testimony, she started receiving calls at an unspecified time to her cell phone a few days prior to spring break, but did not answer them because she did not recognize the number. (Pl. Dep. 68:17–70:2, 73:22–25.) Plaintiff confirmed that she had not been a victim of harassment while at school and that the calls came as a surprise. (Richter Dep., Exh. P39.) Plaintiff did not suspect that any of these unanswered calls would be harassing. (Pl.'s Dep. 74:1–15.)

Plaintiff did not answer any harassing phone calls until April 4, 2012, the first day of spring break, while she was at her grandmother's house. (Id. 74:8–20.) In the span of the next three days, she answered approximately nineteen more phone calls, which involved the racially and sexually charged comments described above. (Id. at 74:21–75:14.) But, Plaintiff does not allege, and the evidence does not reflect, that these phone calls continued after spring break. The undisputed facts of record do not establish that Defendants had any control over the context in which the harassing phone calls were occurring.

In an effort to raise an issue of material fact on this point, Plaintiff repeatedly argues that I must consider the many unanswered calls from the private number prior to April 4, 2012. She posits that some of the calls made on April 4, 2012 may have been made during school hours because the students might have remained after school for other activities. Based on those phone calls, Plaintiff contends that Defendants did, in fact, have control over the context of the harassment and the harassers.

The evidence cited by Plaintiff in support of her claim that the calls occurred during school hours, however, is speculation, unsupported by facts. Although Plaintiff stated that she received some phone calls that she did not answer from a private number prior to spring break, she offers no proof that they were harassing phone calls or that they occurred during school hours. She testified as follows:

Q.    Where were you when you received these first two calls?

A.    Well, there were calls—and this goes to the wording of on or about April 4th. I received—well, calls were incoming to my phone a few days. So spring break started Wednesday. I believe that is April 4th. I received some calls incoming to my phone from this private number periodically a few days prior to that. I don't know the exact time frame, but I know that I was receiving calls so that by Wednesday night when the calls started to increase[], which is going back to when I said that my mother said not to answer phone numbers that I don't know where they're coming from.
      The only reason I answered was because this random blocked number kept calling my phone. So I figured I'm going to answer and tell them not to call again or I'm going to find out why they're calling me, neither of which happened because of the things they said that threw me off.
      So I received a few phone calls prior to April 4th. And then April 4th at night is when I finally started answering them, and I was at my grandmother's house.
                        . . .
      I think I just want to highlight that these are calls totaling 19 in which I answered. So from the 4th to the 6th, that is the time period that I started answering some of them, not answering some of them.

But that's not—that number 19, I don't believe, not that I've counted, but I don't believe that they include the phone calls before I started answering. Just to clarify.

(Pl.'s Dep. 73:12–74:20.)

Q.  In Paragraph 26, right in the middle, you say that some of the phone calls and messages took place during school hours. That suggested the students leaving these voice messages on Plaintiff's phone were on school premises.
How do you know they took place during school hours?

A.  The phone records have the call log of what time that the calls and messages were taking place. And during the school hours, I forget what they are now, but the time of the calls were within the set school hours.

Q.  Have you actually seen the phone records?

A.  I've briefly skimmed over them, but not to detail.

. . .

Q.  Do you have any more specific recollection of what days the phone calls were made that you believe that were made in school?

. . .
A.  No.

(Pl.'s Dep. 95:8–96:2; 96:18–97:9.)

Regarding when the calls were made, Detective Richter testified that he obtained records from Sprint, which only reflected ten calls, none of which were during school hours. (Richter Dep. 61:18–64:20.) Although he noted that Plaintiff and her mother represented that there were more phone calls than those that appeared on the Sprint record, those were the only ones he could verify. (Richter Dep. 64:21–66:17.)[3]

---

[3]  Plaintiff cites Assistant Principal Schoonover's testimony as proof that calls occurred prior to spring break. Plaintiff, however, reads that testimony out of context and completely mischaracterizes it. Schoonover testified as follows:

Considered in the light most favorable to Plaintiff, the facts of record reflect that although Plaintiff received some calls from an unknown number at an unspecified time just prior to spring break, Plaintiff could not verify exactly when these calls occurred, could not discern who exactly was calling, and did not answer these calls. Accordingly, there is no evidence of any racially or sexually harassing phone calls during school hours or on school grounds from which any reasonable juror could find that Defendants had control over both the harassers and the context of the harassment. As Plaintiff bears the burden of proving this factor and as no genuine issue of material fact exists on this point, I will dismiss the Titles VI and IX claims based on these phone calls.[4]

---

Q.      When you were listening to those voice messages, were you able to determine whether those—some of those messages were left before or after spring break?

A.      They were all before spring break. ***Well. I should say during spring break actually because that's what she was reporting to me.***
                                        . . .
Q.      I'm asking you now when you were listening to the voice messages, when you were listening to it, when she started playing, did the recording tell you what dates those voice messages were left in the phone?

A.      No.

(Schoonover Dep. 38:3–23 (emphasis added).)

Plaintiff also cites to Detective Richter's testimony for the premise that one of the students admitted to making "at least one call earlier" to Plaintiff's phone number, but that Richter failed to obtain that phone record to see when and what time that call was made. (Richter Dep. 52:19–53:4.) Plaintiff has not produced any evidence that this "earlier" phone call was made either at school or during school hours.

[4]      Plaintiff argues that Defendants' failure to remedy the out-of-school conduct is contrary to the School District's policies, which forbid bullying of students by other students outside and which provide for disciplinary remedies in such cases. These policies, however, do not set the standard by which Title VI and Title IX claims must be judged and it is outside the Court's province to enforce these policies.

*Whether the Harassment Was So Severe or Pervasive, and Objectively Offensive that It Could Be Said to Have Deprived Plaintiff of Access to Educational Opportunities*

Claims of harassment under Title IX are, in effect, claims for the creation of a "hostile [educational] environment." <u>Saxe v. State Coll. Area Sch. Dist.</u>, 240 F.3d 200, 205 (3d Cir. 2001). As noted above, to recover against a school district in a case of student-on-student racial or sexual harassment, "a plaintiff must establish sexual [or racial] harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." <u>Davis</u>, 526 U.S. at 651. The United States Supreme Court has instructed that "[w]hether gender [or race]-oriented conduct rises to the level of actionable 'harassment' . . . 'depends on a constellation of surrounding circumstances, expectations, and relationships . . . .'" <u>Davis</u>, 526 U.S. at 651 (quoting <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 82 (1998)). These circumstances include, but are not limited to, "the ages of the harasser and the victim and the number of individuals involved." <u>Id.</u> Furthermore, the Supreme Court has remarked that courts evaluating Title IX claims "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults" since at school they "often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." <u>Id.</u> "Damages are not available for simple acts of teasing and name-calling among school children . . . even where these comments target differences in [race or sex]." <u>Id.</u> Ultimately, it is unlikely that a single instance of "one-on-one peer harassment," no matter how severe would be actionable under Title VI or Title IX since it is "unlikely that Congress would

have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would [thereby] be invited . . . ." Id.

While the "severe and pervasive" standard is case-dependent, courts have repeatedly found that isolated or sporadic instances of teasing or harassment, even when related to race or sex, are not actionable. For example, in Whitfield v. Notre Dame Middle School, 412 F. App'x 517 (3d Cir. 2011), the Third Circuit addressed what constituted severe and pervasive harassment actionable under Title VI. The plaintiff, an African-American female student, described several offensive incidents taking place at school. The first occurred in the school lunchroom when a Caucasian female student sat next to her, slapped her, spit in her face, and said that the plaintiff did not belong at the school. Id. at 519. A second incident occurred during class, when a student sitting next to the plaintiff exclaimed that another student had not showered and smelled bad. The other student told the plaintiff that "if I didn't take a shower I would look like you[,] black." Id. A third incident occurred when the plaintiff, while waiting for the bus, was approached by several female classmates, who scratched her and sent her to the emergency room with an abrasion. Id. Subsequently, a rash of other events took place: students accused plaintiff of saying that another student's family was racist; a student attempted to throw the plaintiff's bag out the window; the plaintiff reported that a Hispanic classmate spit on her bag; and the plaintiff found chewing gum stuck between her books in her locker. Id. at 520.

The plaintiff sued the school under Title VI and the District Court granted summary judgment in favor of the defendants because, in part, the harassment was not so severe, pervasive or objectively offensive that it deprived her of access to educational opportunities. Id. On appeal, the Third Circuit affirmed this decision finding that the lower court "properly concluded that the

combined actions and incidents experienced by [the plaintiff] did not rise to the level of severe and pervasive harassment." Id. at 521 (internal quotation marks omitted).

Similarly, in D.V. by and through B.V. v. Pennsauken Sch. Dist., 247 F. Supp. 3d 464 (D.N.J. 2017), the court addressed whether student-on-student sexual harassment was severe and pervasive within the meaning of Title IX. According to the plaintiff's guardians, Plaintiff, a sixteen-year-old boy with autism, was generally bullied by his classmates for perceived sexual orientation and, on one instance, several students circled plaintiff in class and called him "gay" while the teacher was out of the room. Id. at 468. The District Court found that the insults were not sufficiently severe or pervasive, noting that, "[a]lthough any sexually oriented taunts or insults are unacceptable, the fact of the matter is that [plaintiff] only experienced this on one or possibly two occasions. Th[ese] [are] the sort of isolated insults that are not actionable." Id. at 475.

In light of this case law, the in-school incidents at issue here, whether considered individually or collectively, simply cannot be said to rise to the level of severity and pervasiveness required to establish a claim under either Title VI or Title IX.

The first incident—Frankie Buccafuri's alleged bragging to other students in the gym about making racial and sexist phone calls to Plaintiff—rests on multiple levels of hearsay and Plaintiff admitted that she was not present for these comments. Rather, the student who heard the comments (Paige), told another student (Josie), who told her mom (Josie's mom), who told Plaintiff's mom (Ms. Williams), who then told Plaintiff. (Pl.'s Dep. 98:8–17, 99:12–14.) Plaintiff has not produced an affidavit or deposition testimony from either Paige, Josie or Josie's mom. As Plaintiff has not demonstrated that such quadruple-hearsay testimony would be admissible at trial, and thus available for consideration by the jury, it cannot be considered on summary judgment review. See Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999) ("[A] hearsay statement that

is not capable of being admissible at trial should not be considered on a summary judgment motion.").[5]  In any event, the fact that this bragging was not directed at or near Plaintiff undermines the notion that it rises to the level of actionable harassment.

The other two in-school incidents, are not so severe and pervasive as to allow a factfinder to conclude that they had the systemic effect of denying Plaintiff equal access to educational benefits or opportunities at Pennridge High School.  The first occurred when Brandon Windish, a boy who was not one of the callers, responded to Plaintiff's allegation that he was cheating off of her by commenting, "are you going to call the cops on me too?"  This question suggested that he was aware of both the phone calls and Plaintiff's action of calling the police about her harassers.  The other incident took place when Plaintiff was walking down the hall and saw a group of boys that she did not know.  She heard one of them say "something along the lines of how drunk were you when they named you Modupe," which was similar to something she heard on one of the calls.  (Pl.'s Dep. 114:1–9.)  Plaintiff conceded that none of these boys talked to her directly.  (Id. at 119:16–22.)  Aside from these events, Plaintiff has identified no further racial or sexual harassment, either in or out of school.  Accordingly, these events stand in isolation.  Such occurrences, while understandably upsetting, cannot be deemed severe and pervasive harassment on which either a Title VI or a Title IX claim can stand against the School District.

---

[5]    While, "[h]earsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony, . . . the mere possibility that hearsay statement will be presented in form of admissible evidence at trial does not warrant consideration of hearsay evidence at summary judgment stage."  Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582, at *9 (W.D. Pa. Aug. 26, 2005) (internal quotations omitted).  Rather, "a party must respond to a hearsay objection by demonstrating that the material would be admissible at trial under an exception to hearsay rule, or that the material is not hearsay."  Id.

In an effort to avoid summary judgment, Plaintiff posits that where, as here, there is a nexus between the off-campus misconduct and the educational setting, a school may be held liable for its deliberate indifference to the out-of-school conduct to the extent it relates to in-school conduct. Plaintiff urges that such cases of "proxy harassment" involve situations where friends of the worst perpetrators tease the victim about the abuse to which she has already been subject out of school, thus contributing to a pattern of severe and pervasive harassment in school and creating a hostile environment.

The cases cited by Plaintiff in support of this argument, however, are distinguishable because, in each, the in-school harassment was so severe and pervasive that it independently provided a basis for Title VI or Title IX liability without regard to the conduct occurring outside of school. For example, in S.K. v. North Allegheny Sch. Dist., 168 F. Supp. 3d 786 (W.D. Pa. 2016), the harassment of plaintiff began through threatening and harassing text messages and Facebook posts prior to the start of school. Id. at 796. Over the course of the year, however, the students who sent the initial messages continued to threaten the plaintiff via text message and verbally both within school and outside of school. Id. The harassment turned into overtly sexual conduct perpetrated in the hallway, lunch room, and at school events, where the plaintiff was called "slut" and "cunt," was frequently taunted about engaging in sexual activities, had a sexually-provocative photo of her distributed in the hallways, and was grabbed, groped, and shoved. Id. at 796–97. Given these facts, the court unequivocally found that the in-school harassment was sufficiently severe and pervasive to survive a motion to dismiss.

In C.S. v. Southern Columbia School District, No. 12-1013, 2013 WL 2371413 (M.D. Pa. May 21, 2013), the court considered a motion to dismiss a complaint alleging Title IX liability against a school district for harassment that started during the summer and off school property

when the plaintiff was sexually assaulted by two follow students. The harassment continued during the school year when the plaintiff had to encounter her attackers, who, along with their friends, subjected her to severe verbal harassment in the hallway and in class. Id. at *3, *9. The students made rude comments and threats to the plaintiff, instructing her not to do anything that could inhibit the assaulters' ability to participate in sports. Id. at *9. The court declined to dismiss the complaint and found that "the School District cannot be liable for the sexual assault that occurred during the summer and off of school property," but could be liable for a sexually hostile environment caused by students during the school year and on school premises. Id.

Plaintiff's other cited cases similarly involve severe and pervasive activity occurring on school premises. See Price ex rel. O.P. v. Scranton Sch. Dist., No. 11-0095, 2012 WL 37090, at *2, 6 (M.D. Pa. Jan. 6, 2012) (finding that complaint stated a plausible claim when it alleged that students verbally harassed the plaintiff throughout her entire seventh grade year and that the harassment continued throughout the summer); Jones v. Indiana Area Sch. Dist., 397 F. Supp. 2d 628 (W.D. Pa. 2005) (denying motion for summary judgment where a student consistently harassed and stalked the plaintiff both on school grounds and off school grounds); Fennell v. Marion Indep. Sch. Dist., 963 F. Supp. 2d 623, 628–29 (W.D. Tex. 2013) (finding that allegations of severe racial harassment of the plaintiff, that started via cell phone texts and on social media, but continued in significant fashion, both physically and verbally, on school premises stated a claim under Title VI); Schroeder ex rel Schroeder v. Maumee Bd. of Educ., 296 F. Supp. 2d 869, 871, 874 (N.D. Ohio 2003) (declining to grant summary judgment where plaintiff suffered physical and verbal sexual harassment at the hands of other students, most of which occurred on school premises, but which, on occasion, continued outside of school); Theno v. Tonganoxie Unified Sch. Dist. No. 464, 377 F. Supp. 2d 952, 968 (D. Kansas 2005) (denying summary judgment where the

plaintiff suffered "unrelenting" torment by his peers for four years, during which they called him "fag," "faggot," jack-off boy," "banana boy," "queer," "flamer," or "masturbator," reflecting a "pattern of harassment that was arguably severe and pervasive").[6]

In contrast with these cases, the sexually and racially harassing telephone call incidents all occurred off of school premises and outside of school hours. The subsequent related in-school incidents—the comment by Windish about Plaintiff calling the cops on him and the one-time overheard comments in the hallway about the phone calls—are isolated and objectively non-severe incidents that cannot be said to have had a systemic effect of denying Plaintiff equal access to an education. Plaintiff alleges no sustained campaign of harassment from which a reasonable jury could conclude that Plaintiff has an actionable Title VI or Title IX claim.

        *c.*      *Conclusion as to Title VI and Title IX Claims Based on Student-on Student Harassment*

Reading all of the evidence in the light most favorable to Plaintiff, I conclude that no reasonable factfinder could find in favor of Plaintiff on her Titles VI and IX claims premised on

---

[6]  Plaintiff also cites two cases from the District of Connecticut where the plaintiffs had been sexually assaulted off campus and outside of school hours. See Doe ex rel. Doe v. Coventry Bd. of Educ., 630 F. Supp. 2d 226 (D. Conn. 2009); Doe ex rel. Doe v. Derby Bd. of Educ., 451 F. Supp. 2d 438 (D. Conn. 2006). In both cases, the attacker's friends continued to mercilessly harass the plaintiffs after the attack, calling them names such as "slut," "whore," and "bitch." The courts in both cases remarked that the mere fact that the plaintiffs and the attackers attended school together could be found to constitute pervasive, severe, and objectively offensive harassment so as to deny the plaintiffs of equal access to school resources and opportunities. Coventry, 630 F. Supp. 2d at 233; Derby, 451 F. Supp. 2d at 444–45. The courts recognized that although off campus teasing could not subject the school to liability, the evidence of "proxy-harassment" bolstered the severity and offensiveness of the plaintiffs having to attend school with their attackers. Coventry, 630 F. Supp. 2d at 234; Derby, 451 F. Supp. 2d at 445.

    Here, while the campaign of racially and sexually charged harassing telephone calls to Plaintiff during spring break is vulgar and despicable, it cannot fairly be compared to the sexual assaults at issue in the above cases. Moreover, unlike the above cases, Plaintiff has stated that there was no pervasive and ongoing harassment related to the outside conduct—other than two isolated incidents—which created a hostile environment.

harassment by other students. The most offensive conduct—the telephone calls—occurred outside of the School's control, off of school grounds, and outside of school hours. Although Plaintiff claims that she received unanswered calls from the private number during school hours, it is undisputed that all of the racially and sexually harassing statements were made during spring break. The remaining incidents that occurred during spring break, while obviously referencing these phone calls, did not persist on any severe or pervasive basis such that a jury could find that they deprived her of access to educational benefits. As Plaintiff has not met her burden in responding to Defendants' Motion, I must grant judgment in favor of Defendants on these claims.

**B.     Section 1983 Equal Protection Claim**

Plaintiff also brings a § 1983 claim against Defendants alleging a denial of her rights under the Equal Protection Clause.

"Under the Fourteenth Amendment, no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" Shuman v. Penn Manor School Dist., 422 F.3d 141, 151 (3d Cir. 2005) (quoting U.S. Const. amend. XIV, § 1). To succeed on a § 1983 equal protection claim, a plaintiff must allege facts demonstrating "purposeful discrimination" on the basis of a protected class, and that she "receiv[ed] different treatment from that received by other individuals similarly situated. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 196 (3d Cir. 2009); Oliveira v. Twp. of Irvington, 41 F. App'x 555, 559 (3d Cir. 2005).

Although municipalities and other local government units, such as public school districts, are among those "persons" to whom § 1983 applies, see Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). However, school districts may not be held responsible for the acts of their employees under a *respondeat superior* theory of liability. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997). Instead, a plaintiff must show that the school district itself—not merely its

employees—has violated the Constitution.  City of Canton v. Harris, 489 U.S. 378, 385 (1989). A plaintiff can do so by showing that (1) the school district's board (2) adopted an official policy (3) that was the "moving force" behind a violation of constitutional rights.  See Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001) ("[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom.") (quoting Monell, 436 U.S. at 694).  An "official policy" need not be written down or formally adopted.  Rather, a plaintiff may state a claim against the school district by alleging a persistent, widespread practice of racial or sexual discrimination, which, although not specifically endorsed or authorized by officially adopted and promulgated policy, is so well-settled and permanent as to constitute district policy.  S.K., 168 F. Supp. 3d at 813.

The precise confines of Plaintiff's equal protection claim against Defendants are unclear. The Second Amended Complaint alleges that the Defendants violated her equal protection rights by "failing to investigate the misconducts of several Caucasian students towards Plaintiff; failing to discipline Frankie Buccafuri, Tom Kantner, Henry Savage, Sammy, and Brandon Windish; failing to adequately train and supervise Creeden, Schoonover, and Ms Gurysh; and manifesting deliberate indifference to sexual and racial ongoing harassment of Plaintiff by other students, including Frankie Buccafuri."  (Sec. Am. Compl. ¶ 93.)  As set forth in detail above, however, Plaintiff has failed to establish any underlying constitutional violation for which Defendants could be responsible.  Moreover, in responding to Defendants' Motion for Summary Judgment on this claim, Plaintiff puts forth no evidence or argument that Defendants established or approved a policy, custom, or practice of allowing teachers to discriminate against students or of turning a blind eye to student-on-student racial and sexual harassment.  Finally, Plaintiff has not set forth

any allegation that Defendants purposefully treated her less favorably than any other similarly situated individuals. Accordingly, I will grant summary judgment in favor of Defendants on this claim.

## IV.    CONCLUSION

My ruling today should in no way be seen as a stamp of approval for the vile behavior engaged in by several students at Pennridge High School. Nor should it be read to suggest that schools have no obligations to react to bullying and respond to pleas for help, even if the harassment may have occurred outside their control. Rather, I simply find that the events at issue in this litigation do not rise to the level of a constitutional violation under Title VI, Title IX, or § 1983, or a violation of the PHRA.

In light of the foregoing, I will grant Defendants' Motion for Summary Judgment in its entirety and enter judgment on the Second Amended Complaint in favor of Defendants and against Plaintiff. An appropriate Order follows.